AMBER L. SCHUBERT (SBN 278696)
aschubert@awkolawllp.com
SONUM DIXIT (SBN 353395)
sdixit@awkolawllp.com
Of Counsel
**AYLSTOCK WITKIN KREIS**
**& OVERHOLTZ PLC**
2193 Fillmore Street
San Francisco, CA 94115
Telephone: (415) 251-6799

ADAM A. SCHWARTZBAUM (*pro hac vice* application forthcoming)
Florida Bar No. 93014
adam@schwartzbaum.com
**SCHWARTZBAUM**
14 NE 1st Avenue, Suite 705
Miami, FL 33132
Telephone: (786) 453-8485
Attorneys for Plaintiffs Jonathon Holbrook, Cherry Mullins, and Scott M. Eckard

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

JONATHON HOLBROOK, CHERRY MULLINS, and SCOTT M. ECKARD, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

HIMS & HERS HEALTH, INC.,

Defendant.

Case No. ____________________

**CLASS ACTION COMPLAINT**

**CLASS ACTION**

**DEMAND FOR JURY TRIAL**

Plaintiffs Jonathon Holbrook, Cherry Mullins, and Scott M. Eckard ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant Hims & Hers Health, Inc. ("Hims" or "Defendant"), and allege as follows based on personal knowledge as to Plaintiffs' own acts and on information and belief as to all other matters:

**NATURE OF THE ACTION**

1. This is a class action arising from Hims's collection and disclosure of Class Members' sensitive health information and electronic communications, including to Amplitude, Inc. ("Amplitude"), Datadog, Inc. ("Datadog"), Meta Platforms, Inc. ("Meta"), Snap Inc. ("Snap"), Reddit, Inc. ("Reddit"), Microsoft Corporation ("Microsoft"), Pinterest, Inc. ("Pinterest"), Google LLC ("Google"), and The Trade Desk, Inc. ("The Trade Desk") (collectively, the "Third-Party Recipients"), without prior notice and consent, through tracking technologies Hims deployed on www.hims.com (the "Hims Website") and www.forhers.com (the "Hers Website," and collectively, the "Websites"). "Hims" refers to Defendant Hims & Hers Health, Inc., which operates both brands. References to either "Website" mean the individual site identified by the context; the particular technologies and disclosures alleged for each site are described below.

2. Hims is a San Francisco–headquartered, New York Stock Exchange–listed direct-to-consumer telehealth company. It sells prescription treatments for erectile dysfunction, premature ejaculation, hair loss, weight loss, depression and anxiety, low testosterone, acne, and skin conditions to approximately 1.1 million active subscribers, and reported approximately $1.48 billion in revenue for fiscal year 2025. Its customer-acquisition model depends on paid digital advertising, which is the business reason the tracking technologies described below are deployed.

3. The Websites function as treatment-seeking tools. A consumer seeking a prescription begins with an online health questionnaire that Hims calls an intake flow or "consultation," disclosing treatment interests, symptoms, goals, and medical history in order to obtain care. As described in the FTC Action, the Hims and Hers brands offer these services through their respective websites. The Hims Website also presents questions outside its purchase funnels, including an online "Low Testosterone Symptom Calculator" requiring no account, a homepage

quiz, and quizzes embedded in editorial articles.

4. Unbeknownst to visitors, Hims has knowingly implemented tracking technologies operated by the Third-Party Recipients (collectively, the "Trackers") that acquire visitors' communications in real time. On the Hims Website, the moment a visitor selects an answer to a health question, the answer itself—in plain, readable text—is transmitted from the visitor's browser to Amplitude, an outside product-analytics company, and written into a durable per-person profile Amplitude maintains on its own servers. Datadog receives the same funnel activity tied to the same visitor and, on the sexual-health and weight-loss funnels, the selected answer itself. Separately, when a visitor merely views one of Hims's health-condition or prescription-product pages, that visit—labeled with the condition—is transmitted on page load to advertising platforms including Meta, Snap, Reddit, Microsoft (Bing), Pinterest, and Google, and to The Trade Desk, an identity-resolution company whose business is matching an anonymous visitor to a real, named advertising profile. Hims also routes the same condition-labeled events from a relay on its own servers to additional platforms, including TikTok, X (formerly Twitter), and PulsePoint, a server-to-server path that bypasses browser-based ad blocking.

5. What aggravates Hims's conduct is the timing and manner of these disclosures. The transmission to Amplitude fires as the answer is selected—before the visitor creates an account and before any consent control appears. On several surfaces, including the Low Testosterone Symptom Calculator, the homepage quiz, and the editorial quizzes, there is no consent control at any point. The only site-wide control Hims presents is a small "Your privacy choices" notice whose sole button is "Got it": it offers no way to refuse, it appears only after every advertising tracker has already fired, and the Hims Website does not honor the Global Privacy Control opt-out signal the visitor's browser transmits. The transmissions themselves record the absence of consent—each Amplitude payload carries privacy_consent_analytics: "Auto," a software-library default rather than the product of any user interaction, together with is_logged_in: false. Hims's own front-end code names the banner it relies upon "custom-wiretap-banner."

6. Nor do the documents Hims does present authorize the conduct. The advertising-partner disclosures in Hims's Privacy Policy name Google, DoubleClick, Facebook, X, and Stripe.

They do not name Amplitude or Datadog—the two companies that actually receive the visitor's health answers—and they do not name TikTok, Snap, Pinterest, Reddit, or The Trade Desk. The Telehealth Consent, the document a mid-funnel checkbox says the visitor "agree[s]" to, is titled an authorization to use and disclose medical information for treatment; it never mentions advertising, analytics, pixels, or cookies at all.

7. This interception of private electronic communications occurs without appropriate notice to visitors and without their consent, in violation of the federal Wiretap Act, as amended by the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* (the "Wiretap Act" or "ECPA").

8. The Wiretap Act makes it unlawful to intentionally intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept any electronic communication, and to disclose or use the contents of a communication knowing that it was obtained through such an interception. 18 U.S.C. § 2511(1)(a), (c), (d). The Third-Party Recipients are not parties to the communications between visitors to the Websites and Hims, and Hims procured their interception of those communications. To the extent Hims contends that it was itself a party to those communications, the exception at 18 U.S.C. § 2511(2)(d) does not apply, because Hims procured the interception for the purpose of committing criminal and tortious acts, as alleged in Count I below.

9. The same interception violates the Florida Security of Communications Act, Fla. Stat. § 934.01, et seq. (the "FSCA"), as to visitors to the Websites in Florida.

10. Under the FSCA, it is unlawful to intentionally intercept, endeavor to intercept, or procure any other person to intercept any wire, oral, or electronic communication without the consent of all parties to the communication. Hims violated the FSCA by deliberately embedding the Trackers on its Websites, thereby procuring the Third-Party Recipients to intercept visitors' private electronic communications—the very answers to the health questions Hims asked them—in real time and without their consent.

11. Independent of those statutory violations, Hims owed Plaintiffs and Class Members a duty of confidence and breached it. Visitors disclosed their conditions, symptoms, moods,

treatment goals, and medical histories to Hims in confidence, for the purpose of obtaining medical treatment from a company that advertised its service as "100% online, private, and secure" and represented that a visitor's "medical records and sensitive information are only accessed by the medical providers managing your care." Hims instead routed those disclosures to analytics and advertising companies for its own commercial benefit.

12. Further, Hims solicited and obtained visitors' sensitive health information and put that data to use for advertising, analytics, conversion-optimization, audience-building, and subscriber-acquisition purposes, without ever compensating them for the value it received. Hims has thereby been unjustly enriched at Plaintiffs' and Class Members' expense.

13. Hims's conduct is also an unfair and deceptive trade practice. Plaintiffs therefore assert a claim under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* ("FDUTPA")—solely for the declaratory and injunctive relief that Fla. Stat. § 501.211(1) makes available to "anyone aggrieved by a violation" of the Act, and expressly not for damages.

14. On July 29, 2026, the Federal Trade Commission, the People of the State of California, and the Utah Division of Consumer Protection filed a joint enforcement action against Hims in this Court, captioned *Federal Trade Commission v. Hims & Hers Health, Inc.*, No. 3:26-cv-07871-VC (N.D. Cal.) (the "FTC Action"). Count I of the FTC Action alleges that Hims deceptively represented that "[s]ensitive health information provided by Users to Hims is only accessed by medical providers providing care," that "Hims' services are private," and that "Hims' services are discreet," when in fact such information "has been shared with third-party Advertising Platforms." Count II alleges that Hims failed to disclose the sharing at all.

15. The government's allegations describe the same practice on both brands. The FTC complaint identifies forhers.com and defines "Hims Platforms" to include both the Hims and Hers websites and apps. It alleges deployment of the Meta Pixel and Conversions API on those Platforms, sharing consumer identifiers together with treatment interests. Hers-specific examples include a Meta tracking-event audience called "Hers – Complete Registration – MH – 30d," a Meta customer-list audience called "Hers Apollo Signups," and Snap lists called "All_Time_Hers_Psych_Signups" and "AllTime_Hers_MH_SignUps_06092022." The FTC

alleges that Meta understood "Apollo" to refer to mental health. These examples plead a companywide practice encompassing Hers consumers, rather than a practice confined to hims.com. FTC Action, Complaint, ECF No. 28, ¶¶ 16–17, 69–76.

16. Plaintiffs assert no claim under the Federal Trade Commission Act or the Restore Online Shoppers' Confidence Act, and this Complaint does not depend on the outcome of the FTC Action. The government's specific factual allegations corroborate Hims's disclosure of consumers' health information and its privacy representations across the two brands.

17. Through this action, Plaintiffs seek to hold Hims accountable for these privacy violations, to obtain appropriate remedies for affected consumers nationwide and for affected Florida residents, and to prevent the continued procurement of interception of electronic communications through Defendant's Websites.

## PARTIES

18. Plaintiff Jonathon Holbrook is an adult citizen and resident of the State of Florida, residing in Jacksonville, Duval County, Florida.

19. Plaintiff Cherry Mullins is an adult citizen and resident of the State of Florida, residing in Treasure Island, Pinellas County, Florida.

20. Plaintiff Scott M. Eckard is an adult citizen and resident of the State of Florida, residing in Haines City, Polk County, Florida.

21. Defendant Hims & Hers Health, Inc. is a Delaware corporation with its principal place of business at 2269 Chestnut Street, #523, San Francisco, California. Hims is publicly traded on the New York Stock Exchange under the symbol "HIMS." Hims owns, operates, and controls both the Hims Website at www.hims.com and the Hers Website at www.forhers.com. Hims is a citizen of Delaware and California. Hims maintains its corporate headquarters, its executive and technical leadership, and, upon information and belief, the personnel responsible for the challenged tracking and disclosure practices on both Websites in San Francisco, California, within this District.

## JURISDICTION AND VENUE

22. Jurisdiction. This Court has subject-matter jurisdiction over Count I under 28 U.S.C.

§ 1331, because that Count arises under the laws of the United States, namely the federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*, which affords a private right of action at 18 U.S.C. § 2520.

23. This Court has supplemental jurisdiction over Counts II through V under 28 U.S.C. § 1367(a), because those Counts arise from the same case or controversy as Count I. All Counts arise from Hims's procurement of third-party tracking and its disclosure and commercial use of health-related communications obtained through the Websites, and rest on a common nucleus of operative fact.

24. This Court independently has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; there are more than 100 members in the proposed Classes; and at least one member of the proposed Classes is a citizen of a State different from Defendant. Plaintiffs are citizens of Florida, and Defendant is a citizen of Delaware and California.

25. The amount in controversy is satisfied. The Wiretap Act entitles each person whose electronic communications are unlawfully intercepted to the greater of actual damages, statutory damages of $100 per day of violation, or $10,000, together with punitive damages and reasonable attorneys' fees and costs. 18 U.S.C. § 2520(b), (c)(2). The FSCA entitles each such person in Florida to liquidated damages computed at the higher of $100 per day for each day of violation or $1,000, together with punitive damages and reasonable attorneys' fees and costs. Fla. Stat. § 934.10(1). The proposed Nationwide Class consists of, at minimum, millions of persons, and the proposed Florida Subclass of, at minimum, tens of thousands of Florida residents. The aggregate amount in controversy therefore exceeds $5,000,000. Plaintiffs' claims for restitution and disgorgement and for injunctive relief further add to the amount in controversy.

26. This Court has personal jurisdiction over Defendant. Defendant maintains its principal place of business in San Francisco, California, and is therefore at home in this State and subject to this Court's general personal jurisdiction. This Court also has specific personal jurisdiction over Defendant, because the conduct giving rise to Plaintiffs' claims—the decision to deploy the Trackers, the engineering of the Websites' code that places visitors' health answers into outbound third-party requests, the configuration and operation of the server-side relay, and the

drafting of the privacy disclosures and consent interface—occurred in and emanated from this District.

27. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), because Defendant resides in this District: its principal place of business is in San Francisco, California, and it is subject to personal jurisdiction here. Venue is also proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this District, where Defendant designed, configured, deployed, and maintains the Websites, the Trackers, the server-side relay, the consent interface, and the privacy disclosures at issue.

28. This District is also the forum in which the related proceedings concerning the same conduct are pending. The FTC Action, *Federal Trade Commission v. Hims & Hers Health, Inc.*, No. 3:26-cv-07871-VC, is pending in this Court. So are private class actions asserting overlapping privacy claims arising from the same tracking technologies, including *Doe v. Hims & Hers Health, Inc.*, No. 4:26-cv-07941-JST; *J.I. v. Hims & Hers Health, Inc.*; and *Pearson v. Hims & Hers Health, Inc.*, No. 3:26-cv-08470-JCS, which together assert claims under the laws of California, Missouri, and other States. Litigating this action in this District will conserve judicial resources, avoid inconsistent rulings concerning the same tracking code and the same consent interface, and permit coordinated pretrial management alongside the government enforcement action addressed to the same practices.

29. Divisional Assignment. Assignment to the San Francisco Division is proper under Civil Local Rules 3-2(c) and (d). A substantial part of the events or omissions giving rise to the claims occurred in San Francisco County, where Defendant maintains its principal place of business and where the Websites, the Trackers, and the disclosures at issue were designed, configured, and deployed.

## FACTUAL ALLEGATIONS

### A. Overview of Website Tracking on Health Care Websites

30. Many websites employ tracking technologies that collect personal data about users' online activities. These technologies have become ubiquitous across the internet, collecting vast amounts of data about user behavior, preferences, and interests. In the health care context, they are

particularly concerning, because they can capture sensitive medical information, including the conditions a user is researching, the symptoms a user reports, and the treatments a user seeks.

31. The concern is at its highest on a direct-to-consumer telehealth website. A telehealth intake questionnaire is the digital equivalent of the conversation that takes place in an examination room. The visitor is not browsing; the visitor is answering a medical question, put to him or her by the company he or she has come to for treatment, in the expectation that the answer goes to a clinician. Capturing that answer as it is typed or clicked, and routing it to outside analytics and advertising companies, discloses the substance of a medical consultation to parties who have no role in it.

32. Hims has implemented tracking technologies on the Websites that acquire visitors' health-related electronic communications without consent. The network-inspection examples, figures, specific funnel paths, and consent-interface observations in Sections B through J below concern the Hims Website. In those Sections, "Website" means the Hims Website. The Hers-specific advertising disclosures and tracking practices are supported by the FTC allegations identified in paragraph 15, including its express allegation that Meta tracking tools were deployed on both Platforms.

**B. Hims's Business Model: No Purchase Without an Answer to a Health Question**

33. Hims operates a managed-services platform that connects consumers to affiliated medical groups, licensed physicians, pharmacies, and laboratories. The consumer pays Hims directly, by subscription or one-time purchase. Hims manages the intake questionnaire, the electronic health record, the prescription workflow, and pharmacy fulfillment. Hims is neither a pharmacy nor a medical practice; it is the layer through which the consumer's health information reaches the clinician, and the only channel through which the consumer may communicate with that clinician.

34. Every prescription purchase begins with an intake funnel. Each funnel is one or two clicks from the homepage and requires no login to begin: the sexual-health funnel for erectile dysfunction and premature ejaculation at www.hims.com/g/i/sh, one click from the homepage hero "Have better sex"; the weight-loss funnel at www.hims.com/g/i/wm, one click from the GLP-1

hero; the hair-loss funnel at www.hims.com/c/hl, one click from "Regrow hair"; the testosterone funnel at www.hims.com/g/i/tt, one click from "Boost testosterone"; the mental-health funnel at www.hims.com/c/mh; and the anti-aging and acne funnels at www.hims.com/c/aa and www.hims.com/c/ac.

35. The intake flow proceeds in four parts. First, the visitor answers a series of approximately five to fifteen questions concerning his or her treatment interests, symptoms, and goals. Second, the visitor is asked to select his or her state and to register an account. Third, the visitor completes a medical assessment of between roughly twenty-five and fifty questions concerning his or her medical history. Fourth, the visitor is shown a potential treatment, its price, and its refill cadence, and is directed to enter billing and shipping information. The health answers at issue in this Complaint are transmitted at the first stage—before any account exists.

36. Hims also runs the same answer-capturing mechanism on surfaces that require no account and are not part of any purchase funnel: the Low Testosterone Symptom Calculator at www.hims.com/lp/tt-start-testo-symp-calc, reachable in two clicks from the footer "Tools" menu; a quiz or pre-quiz modal that appears on the Website's homepage; and quizzes embedded in editorial articles, such as the hair-trait quiz at www.hims.com/check/what-haircut-should-i-get-quiz.

**C. The Tracking Technologies Deployed on the Website**

37. Amplitude, Inc. is a publicly traded product-analytics company (NASDAQ: AMPL) headquartered in San Francisco, California. Amplitude's business is ingesting behavioral data onto its own servers and converting it into durable user profiles, audience segments, and engagement products that it sells to its own customers. Amplitude does not merely hold data on Hims's behalf; it processes what it receives on its own infrastructure, for its own commercial platform. Hims has implemented Amplitude's technology on the Website, including inside the intake funnels and quizzes, and transmits visitors' selected health answers to api.amplitude.com.

38. Datadog, Inc. is a publicly traded monitoring and analytics company (NASDAQ: DDOG). Hims has implemented Datadog's technology on the Website, which ingests the visitor's funnel session into Datadog's own analytics product on Datadog's own infrastructure, cross-linked

to the same visitor identified in Amplitude's copy, and which on the sexual-health and weight-loss funnels also captures the selected answer itself.

39. Meta is a multinational technology company that operates Facebook and Instagram and one of the world's largest advertising platforms. Its business model depends on collecting user data across contexts and using it to target advertising. Hims has implemented the Meta Pixel and Meta's Conversions API on the Website, and, as the FTC Action alleges, has also uploaded customer lists to Meta for audience matching.

40. Snap, Reddit, and Pinterest each operate a social-media and advertising platform together with an advertising pixel. Hims has implemented each of their pixels on the Website, which transmit information about visitors' interactions—including the health-condition page visited—together with each platform's persistent advertising identifiers.

41. Microsoft collects user data through its Bing search and advertising network and its Universal Event Tracking ("UET") tag. Hims has implemented Microsoft's UET tag on the Website; when a visitor loads a page carrying the tag, information about the page and the visitor's activity is transmitted to bat.bing.com together with Microsoft's MUID cookie.

42. Google operates one of the world's largest online advertising platforms and generates most of its revenue from targeted advertising. Hims has implemented Google's advertising and analytics technology on the Website, including conversion and Floodlight activity routed through a first-party-cloaked server-side tag manager at tm.hims.com, which transmits the funnel or condition page and a durable advertising identifier to Google.

43. The Trade Desk, Inc. is a publicly traded advertising-technology company (NASDAQ: TTD) whose core business is identity resolution and audience resale: it exists to convert an anonymous visit into a named, marketable profile and to sell access to that profile across the open web. Hims has implemented The Trade Desk's pixel on at least forty-seven of the Website's health-condition and product pages, where it receives the visitor's identifiers and matches them against The Trade Desk's cross-web identity graph.

44. In addition to the browser-based Trackers, Hims operates a relay on its own server infrastructure—observed at endpoints including us-central1-clubroom-prod.cloudfunctions.net—

that posts the same condition-labeled events to platform endpoints server-to-server. Because that path originates from Hims's own servers rather than the visitor's browser, it is not visible to, and cannot be blocked by, browser-based privacy tools. For TikTok, X, and PulsePoint, the relay is the only observed transmission path, and the onward receipt by those platforms is a subject for discovery against Hims's relay configuration and server logs.

45. Each of the Third-Party Recipients' own privacy disclosures confirms that it uses the data it collects to advertise and market to users, including by targeting advertising and by combining data collected from different contexts to build unified profiles. For these recipients, the health-condition signal is not incidental to some service performed for Hims; it is the product.

46. When a visitor loads a page on the Website, the visitor's browser sends an HTTP request to the Website's server. In response, the server returns the webpage, which contains small pieces of code known as trackers, tags, or pixels. That code instructs the browser to send the visitor's interactions—along with identifying data such as cookies, browser details, IP address, and device information—to the Third-Party Recipients, in real time and in parallel with the visitor's communications with Hims.

47. The transmissions described in the following figures are documented in live network-inspection captures taken in the Chrome DevTools Network panel on the Hims Website, and in decoded outbound request payloads reflecting requests generated when a visitor interacts with that site. These figures illustrate the Hims Website; they are not network captures from forhers.com.

### D. The Intake Funnels Transmit the Visitor's Health Answers to Amplitude and Datadog in Real Time

48. On each intake funnel, the moment the visitor selects an answer to a health question, the browser issues an HTTP POST request to api.amplitude.com. The request payload carries the answer the visitor selected in the selected_choices and selected_choices_one_line fields of an event Hims names visit:selected_visit_use_case. The browser then issues a second POST carrying an $identify event that writes the same answer into a durable Amplitude user profile, in the field user_properties.$set.selected_consult_choices. The answer is therefore taken twice: once as a transient event, and once as a lasting attribute of a per-person record. Both transmissions fire while

the visitor is logged out, and before any consent control appears.




*Figure 1: The sexual-health intake at www.hims.com/g/i/sh. The visitor selects "Getting hard and staying hard" (left), and the browser posts the answer to api.amplitude.com (right) in the companion $identify call, which writes selected_consult_choices = ["i-sh-getting-hard-and-staying-hard"] into the visitor's durable Amplitude user profile.*

49. On the sexual-health funnel, the Website asks "How do you want to improve your performance?" When the visitor selects "Getting hard and staying hard," that answer is transmitted to api.amplitude.com as selected_choices = ["i-sh-getting-hard-and-staying-hard"], in an event whose visit_type is "ED," and is written to the visitor's durable Amplitude profile by a companion $identify call issued in the same instant. The answers that follow are transmitted the same way: "How often do your symptoms disrupt your sex life?"—"Pretty often"; "Have you tried treatment before?"—"No"; "How would you like to approach treatment options?"—"I'd like a recommendation"; and the visitor's selected state.




*Figure 2: The visitor's self-reported mood on a psychiatry intake transmitted verbatim to api.amplitude.com as selected_choices = ["Sad"], in an event whose visit_type is "PSYCHIATRY," followed immediately by an $identify write of the same value to the visitor's persistent profile.*

50. On the mental-health funnel, the Website's first question is "Before we get started—how are you feeling today?" When the visitor selects "Sad," the word "Sad" is transmitted verbatim to api.amplitude.com as selected_choices = ["Sad"], in an event labeled with the visit type "PSYCHIATRY," and is written to the visitor's persistent Amplitude profile. Later answers on the same funnel are transmitted the same way, including "How much experience do you have with medication?"—"First timer"—and the visitor's state and date of birth, the latter transmitted as an age, a birth year, and an age bracket.




*Figure 3: On the hair-loss funnel the answer travels as the visitor's own English sentence rather than as a code—selected_choices = ["Receding hairline, want to slow its progress"].*

51. The hair-loss funnel is the most extensive. Thirteen separate answers were confirmed transmitted verbatim to api.amplitude.com, and on this funnel the answers travel as the visitor's own English sentences rather than as internal codes: "Which best represents your hair loss and goals?"—"Receding hairline, want to slow its progress" and "Experiencing hair loss, ready to start treatment ASAP"; "Where are you noticing changes to your hair?"—"All over"; "How much hair have you lost?"—"A lot"; "When did you start noticing changes to your hair?"—"In the past few months"; "Does hair loss run in your family?"—"Yes," transmitted in an event whose page field is "family_history"; "How often do you tend to experience stress?"—"All the time"; the visitor's hair type, length, and styling; the visitor's state; and the visitor's date of birth, transmitted as an age, a birth year, and an age bracket. Several of these answers were also written to the visitor's durable Amplitude profile.

52. The hair-loss funnel also carries an affirmative representation that contradicts what the code does. Beneath the answer choices, the page states: "The quiz is not a medical assessment and your responses will not be shared with a medical provider. Hims uses your responses to personalize your experience and for other uses as described in our Privacy Policy." The first sentence is a representation that the answer is not going to a clinician. It is accurate as far as it goes—and it is precisely the point: the answer serves no treatment purpose whatever, yet Hims transmits it in the same instant to two outside analytics companies and writes it into a durable commercial profile of the visitor. The second sentence does not cure that. A reference to "other uses as described in our Privacy Policy" is not notice of interception by Amplitude and Datadog, which that Policy never names.

53. On the weight-loss funnel, the answers transmitted to api.amplitude.com include the treatment the visitor has in mind ("GLP-1 pills"), the visitor's weight-loss goal ("Losing 16-50 lbs," transmitted as i-wm-hims-16-50-lbs), the form of GLP-1 medication the visitor selects ("Pills," transmitted as i-wm-hims-pills), and what reaching a goal weight would mean to the visitor ("Improving overall health"). On the testosterone funnel, the answer to "Which areas of your health are you looking to improve?" is transmitted as selected_choices = ["i-tt-energy"] in an event whose visit type is "TMNT." On the acne and skin funnels, the answer to "What goals do

you have for your skin?" is transmitted verbatim as selected_choices = ["Get rid of dark spots"] in an event whose visit type is "SKINCARE_AGING."

54. Datadog receives the same funnel activity, cross-linked to the same visitor by the same device identifier that appears in Amplitude's copy, on every funnel; and on the sexual-health and weight-loss funnels, Datadog's interaction tracking also carries the selected answer itself, verbatim and unmasked, in plain text.

55. Neither Amplitude nor Datadog is named anywhere in Hims's Privacy Policy.

**E. The Low Testosterone Symptom Calculator Transmits Both the Question and the Answer, With No Consent Control and an Affirmative Misrepresentation**

56. The Low Testosterone Symptom Calculator at www.hims.com/lp/tt-start-testo-symp-calc requires no account and no login. It is reachable in two clicks from the Website's footer, under "Tools." It presents eight questions about the visitor's symptoms.

57. Each of the eight answers is transmitted to api.amplitude.com as a page:click event in which the title field carries the question verbatim and the id field encodes the visitor's answer. The eight questions, each confirmed transmitted with the answer "Yes," are: "Do you feel like your energy levels are low?" (id low-t-calculator-quiz-energy-1-yes); "On some or most days, do you need to nap to feel awake and alert?"; "Do you feel like you have a low sex drive?"; "Do you sometimes have difficulty getting or keeping a hard erection?"; "Do you feel like your muscle strength is lower than it should be?"; "Do you struggle with motivation?"; "Do you feel more brain fog or less mentally sharp than before?"; and "Do you have a sad or depressed mood most of the time?" (id low-t-calculator-quiz-mood-3-yes).




*Figure 4: On the no-login Low Testosterone Symptom Calculator, both the depression-symptom question and the visitor's answer reach a third party in plain text, pre-consent.*

58. Because both the question and the answer are transmitted, the recipient learns the content of the exchange as fully as if it had read a sentence. A payload carrying the words "Do you have a sad or depressed mood most of the time?" together with an identifier ending in "-yes" discloses a self-reported depressive symptom as plainly as any sentence could, and a payload carrying "Do you sometimes have difficulty getting or keeping a hard erection?" with the same suffix discloses a self-reported symptom of erectile dysfunction.

59. There is no consent box on this surface at any point in the flow, and no consent control of any kind precedes the transmissions. Every answer is nevertheless transmitted to Amplitude, an outside company, with the visitor's Facebook advertising cookie attached.

## F. The Homepage Quiz and the Editorial Quizzes Capture Answers with No Consent Control at All

60. A quiz or pre-quiz modal appears on the Website's homepage at www.hims.com, identified in the Website's own code as ng-nn-wm-quiz-modal. A single click on an answer transmits it to api.amplitude.com as a page:click event: "Do you have a treatment in mind already?"—"GLP-1 pills," transmitted as title = "glp-1-pills"; "Why do you want to lose weight?"—"Feel better in my clothes," transmitted as title = ["feel-better-in-clothes"]; and "What matters most to you about your treatment?"—"Results that last." No consent control is presented at any point.

61. Hims also embeds answer-capturing quizzes inside ordinary editorial articles that require no login. On the hair-trait quiz at www.hims.com/check/what-haircut-should-i-get-quiz, the answer to "How dense is your hair?"—"Thin"—is transmitted to api.amplitude.com as title = "Thin" with id = "quiz-one-buttom-thin," the identifier encoding both the question slot and the answer. No consent control is presented at any point.

### G. The Answers Are Joined to Persistent Identifiers and to the Visitor's Advertising Identity

62. The health answers do not travel alone. Each Amplitude payload also carries a set of persistent identifiers: an Amplitude device identifier that survives across sessions (for example, device_id = D6XUrMk3yFYiUlLc9F41_W); Hims's own persistent visitor cookie (hermsuid_cookie, for example a47b8ccf-a09f-4cb0-81f7-c054f5f541c9); a session identifier; a server-side identifier Hims assigns to the visit (server_unique_id); the visitor's IP address; and the visitor's operating system, device model, browser, and language. In the ordinary course, the visitor's user-agent string is transmitted as well.

63. Critically, each payload also carries hfbp_cookie—the visitor's Facebook advertising cookie (for example, fb.1.1782906565555.1699156229). Because the Facebook advertising cookie travels inside the very same message as the health answer, the answer is not anonymous. It arrives joined to the identifier by which the largest advertising platform in the world recognizes that specific person, so the medical fact can be matched back to a real, cross-web individual and used to build or target advertising audiences keyed to the health condition.

64. The $identify transmission compounds the harm. The answer is not merely observed in passing; it is written into a durable per-person profile on Amplitude's servers as a lasting attribute of that person, where it remains after the visitor closes the browser, whether or not he or she ever returns, creates an account, or buys anything.

65. The payloads themselves record that no consent preceded them. In each, the fields privacy_consent_analytics, privacy_consent_advertising, privacy_consent_functional, and privacy_consent_sale_of_info are set to "Auto"—a software-library default value, not the product of any interaction by the visitor with any consent control—and the field is_logged_in is set to false.

At the moment of transmission, no consent management banner had been displayed.

**H. The Health-Condition and Product Pages Transmit the Visitor's Condition on Page Load**

66. At least forty-seven pages on the Website are health-condition and prescription-product pages, each public, requiring no account, and reachable in one or two clicks from the homepage. The subject matter of the page is the condition: www.hims.com/erectile-dysfunction, www.hims.com/erectile-dysfunction/sildenafil, and www.hims.com/tadalafil; www.hims.com/premature-ejaculation/sertraline-for-pe; www.hims.com/hair-loss, www.hims.com/hair-loss/finasteride, and www.hims.com/hair-loss/minoxidil; www.hims.com/weight-loss, www.hims.com/weight-loss/wegovy-pill, and www.hims.com/weight-loss/ozempic-pill; and www.hims.com/psychiatry/sertraline and www.hims.com/psychiatry/escitalopram. A single visit tells the recipient the exact condition the visitor is researching and, on the product pages, the specific prescription drug he or she is considering.

67. On page load, and before any banner appears, the condition-labeled visit and the visitor's identifiers leave the browser. Meta, Snap, Reddit, Microsoft (Bing), Pinterest, and Google each receive the transmission by their own pixel. Reddit receives a custom event named for the condition. Every one of these transmissions fires within the first fraction of a second of page load.

68. Hims additionally forwards the same condition-labeled events from its own servers to platform endpoints server-to-server. For Meta, Snap, and Reddit, that path duplicates their confirmed browser pixels. For TikTok, X, and PulsePoint, the server-side relay is the only observed path, and their onward receipt is a subject for discovery.

69. The Trade Desk receives the visit by pixel and matches the visitor's identifiers against its cross-web identity graph, turning an anonymous session into a real, named advertising profile with the health-condition interest attached. On the erectile-dysfunction product page, a further layer of programmatic advertising networks also fires on load, broadcasting the visit into the open market.

70. On the erectile-dysfunction product page, Meta, Snap, and Criteo each receive a

product-view event on page load, each carrying that platform's identifying cookie, so each learns that the visitor viewed an erectile-dysfunction product. Hims obscures the product name and page address in that event, but the obscured value is identical for every visitor and can be matched back against Hims's known product list, so it still identifies the product; and the identifying cookie travels in the clear regardless.

71. The interception is not limited to the interactions described above. Every page address a visitor requests on the Website—including pages describing conditions, symptoms, treatments, and specific medications—is transmitted to Third-Party Recipients in real time, together with their respective persistent identifiers. This Complaint focuses on the Trackers documented here; discovery may reveal additional recipients and additional tracking products deployed on the Website.

## I. Defendant's Responsibility for the Interception of Electronic Communications

72. Although the Trackers perform the technical acquisition and transmission functions, Hims is legally responsible under the Wiretap Act and the FSCA because it intentionally procured, enabled, directed, authorized, and caused the Third-Party Recipients to acquire the challenged communications.

73. Hims knowingly made the affirmative decision to implement the Trackers on www.hims.com. That implementation was deliberate and required Hims, or persons acting on its behalf, to configure and deploy the code, including inside the intake funnels and quizzes themselves. The tracking here is not a generic page-view tag. Hims's code is wired to fire on the selection of an answer to a health question and to place the value of the answer field into an outbound third-party payload, and to issue a second call writing that same value into a durable third-party profile. Mapping a specific health-answer field into a third-party request is an engineering decision, not an incident of ordinary website operation.

74. Hims controls, participates in controlling, or has the contractual and practical ability to control which pages and events on its Website trigger tracking. At minimum, Hims could elect not to procure tracking on its health questionnaires, its symptom calculator, its quizzes, and its condition and product pages. That Hims can make that choice is demonstrated by the Website

itself: at certain steps of certain funnels—for example, the date-of-birth step and the state-selection step on the weight-loss funnel—the visitor's input was transmitted only to Hims's own first-party endpoints and not to any third party. Hims therefore knows how to keep an answer in-house, and chose not to for the answers at issue.

75. Hims also built and operates the server-side relay on its own infrastructure, an affirmative act by Hims that transmits the visitor's condition-labeled activity to advertising platforms from Hims's own servers, beyond the reach of any privacy tool the visitor might employ.

76. Without Hims's implementation and continued operation of this code, the Third-Party Recipients would not have acquired the communications at issue.

## J. Hims's Privacy Disclosures and Consent Interface Do Not Authorize the Tracking Conduct

77. Visitors are not required to affirmatively agree to anything before browsing the Website's condition and product pages, before answering the homepage quiz or an editorial quiz, before completing the Low Testosterone Symptom Calculator, or before answering the first several questions of an intake funnel.

78. The only site-wide control Hims presents is a "Your privacy choices" notice: a non-blocking corner notice that does not overlay or lock the page. Its full text reads: "We and our partners use tracking technologies to collect data about you and your site interactions, personalize ads, and improve our services. See our Privacy Policy to learn more and manage your privacy choices." It has one button: "Got it." There is no reject control, no decline control, and no opt-out of the sale or sharing of personal information. Every advertising tracker fires before the notice appears, so pressing "Got it" does not stop any transmission; it only dismisses the notice.




*Figure 5: The only site-wide consent control Hims presents. There is no option to refuse, and it appears after the advertising trackers have already fired.*

79. Hims's own front-end code names this banner "custom-wiretap-banner."

80. The Website also does not honor Global Privacy Control, the standardized opt-out preference signal that a visitor's browser transmits with every request. The Trackers fire and the data is shared even when that signal is asserted.

81. The advertising-partner disclosures in Hims's Privacy Policy name Google (DoubleClick), X (formerly Twitter), Facebook, Google Analytics, and Stripe. They do not name Amplitude. They do not name Datadog. Those are the two companies that actually receive the visitor's selected health answers, and they appear nowhere in the document.

82. Far from authorizing the tracking conduct, Hims's Privacy Policy is an admission against interest. It states: "if you view a webpage about balding or erectile dysfunction treatments, we may provide that information to an advertising partner who will then deliver advertisements to you on different websites based on your viewing activity." It further states: "NOTICE: We may sell your sensitive personal data." Hims thus concedes both the sensitivity of the information and the fact of the sharing. But the document is also its own limit: it discloses sharing with a single, unnamed "advertising partner," while the conduct alleged here sends the visit to a stack of named recipients the policy never identifies. A generic acknowledgment that some data reaches some partner is not disclosure of, and cannot be consent to, interception by these specific companies.

83. The Telehealth Consent, the document the mid-funnel checkbox tells the visitor he or she "agree[s]" to, is titled "AUTHORIZATION TO USE AND DISCLOSE MY MEDICAL

INFORMATION AND CONSENT TO TELEHEALTH." It authorizes the use and disclosure of medical information for diagnosis, treatment, and communication with providers. It does not mention advertising, analytics, marketing, pixels, or cookies anywhere, and it names no advertising or analytics company. A document that authorizes disclosure to clinicians for treatment is not authorization for disclosure to advertisers for marketing.

84. The only text Hims places near the health questions themselves does not supply consent either. Several funnels display a disclaimer stating that Hims "uses your responses to personalize your experience and for other uses as described in our Privacy Policy." That sentence is a passive notice, not a request for permission: it presents no choice, offers nothing to accept or refuse, and appears alongside answers that have already been transmitted. It points to a Privacy Policy that names neither Amplitude nor Datadog. And a statement that Hims itself may use a response for its own purposes is not disclosure that the response is being routed, as it is selected, to outside companies that will use it for theirs.

85. Consent is limited to the specific conduct authorized. A reasonable person would not understand a footer-linked privacy policy—let alone a treatment authorization—to permit the real-time transmission of his or her answer to a question about erectile dysfunction, depressed mood, or hair loss to outside analytics and advertising companies, joined to the advertising identifier by which those companies recognize him or her.

86. Where a checkbox exists at all, it comes too late and covers the wrong thing. The answers that precede it have already been transmitted, and checking a box cannot un-send them. The funnel continues past the box, and the answers that follow continue to be transmitted. And the documents the box references name neither of the companies that receive the answers. On the surfaces described in Sections E and F above, no box exists at any point.

87. As the FTC Action alleges, Hims made widespread privacy representations in advertising for the Hims and Hers Platforms, conveying that consumers' health information would not be disclosed to third parties. FTC Action, Complaint, ECF No. 28, ¶¶ 60–66. For example, until at least late August 2023, the Hims Website answered "How does Hims ensure patient privacy?" by assuring visitors that their "medical records and sensitive information are only

accessed by the medical providers managing your care." Hims also advertised a "100% online, private, and secure" process, approved influencer descriptions of its service as "discreet," and promoted its service as "totally private."

### K. The Information Hims Disclosed Is Individually Identifiable Health Information That Federal Law Forbids Disclosing, and Its Disclosure Inflicts a Distinct and Serious Injury

88. Plaintiffs assert no claim under the Health Insurance Portability and Accountability Act ("HIPAA"), and Plaintiffs acknowledge that HIPAA affords no private right of action. The allegations in this Section are pleaded for two limited purposes: to establish the character and sensitivity of the information Hims disclosed and the concrete, non-speculative nature of the resulting injury to Plaintiffs and Class Members, which exists independent of any statutory violation; and to establish that Hims acted knowingly, having been squarely and publicly warned that the conduct was unlawful.

89. HIPAA and its implementing regulations protect "protected health information," defined as "individually identifiable health information" transmitted or maintained in any form or medium. 45 C.F.R. § 160.103. Individually identifiable health information is health information that (1) is created or received by a health care provider, health plan, employer, or health care clearinghouse; (2) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or payment for the provision of health care to an individual; and (3) identifies the individual, or with respect to which there is a reasonable basis to believe the information can be used to identify the individual. *Id.*

90. Hims holds itself out as a provider and coordinator of medical care. It operates the intake questionnaires by which patient information is gathered, maintains the electronic health record, transmits patient information to the medical providers with whom it contracts, routes prescriptions to pharmacies, and is the only channel through which a patient may communicate with the treating provider. Hims is a covered entity within the meaning of 45 C.F.R. § 160.103 or, in the alternative, a business associate of the affiliated medical groups through which care is furnished on its platform. Either way, Hims is subject to HIPAA's prohibitions on the unauthorized

use and disclosure of protected health information, 45 C.F.R. § 164.502(a), and to the Privacy Rule's requirement of a written authorization for any disclosure of protected health information for marketing, 45 C.F.R. § 164.508(a)(3).

91. The information at issue satisfies the second prong of the definition. When a visitor answers that what he wants from treatment is "getting hard and staying hard"; that his or her mood today is "Sad"; that he or she has "a sad or depressed mood most of the time"; that he "sometimes ha[s] difficulty getting or keeping a hard erection"; that he or she has lost "a lot" of hair and that hair loss runs in the family; or that his or her weight-loss goal is "Losing 16-50 lbs" and the medication he or she wants is a GLP-1 pill—he or she discloses information relating to his or her past, present, or future physical or mental health or condition and to the health care he or she is seeking. The Websites' condition and product pages disclose the same, by the address of the page alone.

92. The identifiers transmitted with the health information permit linkage to a person. As alleged above, the Hims answer transmissions include persistent device, visitor, advertising, and session identifiers, IP addresses, and device and browser details. The Hers advertising events alleged in the FTC Action combine consumer identifiers, including email and IP addresses, with treatment interests. HIPAA's de-identification safe harbor requires removal of specified identifiers, including email addresses, IP addresses, and unique identifying numbers or codes. 45 C.F.R. § 164.514(b)(2)(i). The challenged transmissions contain identifiers rather than de-identified aggregate health information.

93. Upon information and belief, Hims has not executed HIPAA-compliant business associate agreements with Amplitude, Datadog, or the advertising platforms for the tracking activities described herein, and has not obtained the HIPAA-compliant authorizations necessary to permit such disclosures for marketing or other non-treatment purposes. To the extent Hims contends that any Third-Party Recipient acted as its business associate, no such agreement could authorize what occurred, because each recipient uses what it receives for its own advertising, profiling, analytics, and identity-resolution purposes.

94. Hims had actual and constructive knowledge that its deployment of third-party

trackers on its Websites was unlawful. In December 2022, and as updated in March 2024, the United States Department of Health and Human Services, Office for Civil Rights, issued guidance expressly warning regulated entities that the use of third-party tracking technologies on websites—including pixels, tags, and analytics code—that transmit protected health information to vendors without a business associate agreement or a valid individual authorization violates HIPAA. The guidance warned that this is so even where the visitor is not an established patient, and even where the transmission originates on an unauthenticated, publicly accessible webpage that addresses specific symptoms or conditions. Hims publishes privacy materials on its Websites reflecting its awareness of health-privacy obligations, and it maintains extensive in-house and outside legal resources.

95. Federal law singles out this category of information for protection because its unauthorized disclosure inflicts a distinct and serious harm: it exposes the individual to embarrassment, stigma, and discrimination, and it deters people from seeking medical care at all. That is not an abstract concern for the conditions at issue here. Erectile dysfunction, premature ejaculation, depression, anxiety, obesity, low testosterone, and hair loss are conditions that people treat through an online service precisely because they will not discuss them face to face. Hims's entire business is built on that fact—it advertises discretion, and it charges for it. The disclosure of exactly the fact the visitor was trying to keep private is itself the injury, wholly apart from any statutory violation and wholly apart from any subsequent misuse of the data.

96. The injury is ongoing and beyond the visitor's control. Once disclosed, health-related information may be processed, combined with other data held by the recipient, appended to a profile of the person, and used for advertising and profiling. The persistent profiles and advertising audiences described above illustrate that risk. Upon information and belief, Plaintiffs' and Class Members' improperly disclosed health information remains in the applicable recipients' systems, and Hims has neither retrieved it nor requested its deletion.

**L. Plaintiffs' Specific Experiences**

**1. Plaintiff Jonathon Holbrook**

97. Plaintiff Jonathon Holbrook is a Florida resident who lives in Jacksonville, Duval

County, Florida. In or about the first half of 2026, and within the applicable limitations period, Mr. Holbrook used the Hims Website on more than one occasion while physically located in Jacksonville, Florida.

98. Mr. Holbrook came to the Hims Website from an advertisement on Facebook for a Hims hair-loss treatment. He accessed the Hims Website from his Apple iPhone 13, using the Safari browser, by following the link from Facebook. He did not use a virtual private network, an ad blocker, or a private or incognito browsing mode. Each of the Trackers described above therefore operated on his device in the ordinary manner alleged.

99. Mr. Holbrook completed a Hims hair-loss questionnaire, answering questions about the hair loss he was experiencing and his goals for treatment. He also answered a quiz that appeared on the Hims Website's homepage. He also used the Hims Website's online low-testosterone quiz and symptom calculator, answering questions about symptoms including his energy, his sex drive, and his mood. He also used the Hims Website in connection with sexual health, answering a quiz on that subject.

100. Before interacting with the Hims Website, Mr. Holbrook was not presented with any cookie banner, pop-up, checkbox, clickwrap, or other affirmative request for permission to disclose his answers or his health-related browsing to the Third-Party Recipients. In the course of the treatment questionnaire he was later directed to a screen asking him to select his state and to create an account, and he created an account. He does not recall being presented with, or agreeing to, any box concerning terms of use or a telehealth consent. By the time he reached that screen, the answers he had already given had already been transmitted to Amplitude.

101. Mr. Holbrook never purchased, subscribed to, or received any product, medication, or treatment from Hims or Hers.

102. In the same manner documented above in Figures 1 through 4, each answer Mr. Holbrook selected on the hair-loss questionnaire, the homepage quiz, the low-testosterone symptom calculator, and the sexual-health quiz was transmitted in real time to Amplitude—as an event property, and again as a write to a durable Amplitude profile—together with his Amplitude device identifier, Hims's persistent visitor cookie, his Facebook advertising cookie, his session

identifier, his IP address, and his device and browser information. In the same manner documented above, the health-condition and product pages he viewed were transmitted on page load to Meta, Snap, Reddit, Microsoft (Bing), Pinterest, and Google, and to The Trade Desk, which matched his identifiers against its cross-web identity graph.

103. Mr. Holbrook did not know of, and did not consent to, any of these transmissions. Had he known that his answers about his hair loss, his sex drive, and his mood would be transmitted in real time to outside analytics and advertising companies and written into a lasting profile of him, he would not have used the Hims Website or would not have answered the questions.

104. Mr. Holbrook's information remains in the possession of the Third-Party Recipients. Upon information and belief, Hims continues to deploy the Trackers described in this Complaint in the same manner, and continues to present the same consent interface and the same disclosures. Mr. Holbrook remains interested in treatment for hair loss and would use the Hims Website again were it not intercepting and disclosing his communications in the manner alleged.

**2. Plaintiff Cherry Mullins**

105. Plaintiff Cherry Mullins is a citizen and resident of the State of Florida. In or about the first half of 2026, and within the applicable limitations period, Ms. Mullins used the Hers Website at www.forhers.com on one or more occasions while physically located in Florida.

106. Ms. Mullins came to the Hers Website out of interest in the treatments Hims markets, including GLP-1 medication for weight loss and treatment for hair loss. She accessed the Hers Website from her Apple iPad, using the Safari browser. She did not use a virtual private network, an ad blocker, or a private or incognito browsing mode. Upon information and belief, Hims's advertising tracking tools operated during her visit in the ordinary course of her interactions with that site.

107. Ms. Mullins answered a hair quiz on the Hers Website. She also completed a treatment questionnaire for a specific treatment, answering questions about the treatment she was seeking, her symptoms, and her goals.

108. Before interacting with the Hers Website, Ms. Mullins was not presented with any cookie banner, pop-up, checkbox, clickwrap, or other affirmative request for permission to

disclose her answers or her health-related browsing to the Third-Party Recipients. In the course of the treatment questionnaire she was later directed to a screen asking her to select her state and to create an account, and she created an account. She does not recall being presented with, or agreeing to, any box concerning terms of use or a telehealth consent. She did not authorize Hims to transmit the contents of her health-related communications to advertising platforms. Upon information and belief, the account-registration interaction generated a treatment-associated event transmitted through Hims's Meta tracking tools without her consent.

109. Ms. Mullins never purchased, subscribed to, or received any product, medication, or treatment from Hims or Hers.

110. Upon information and belief, during Ms. Mullins's interactions with the Hers Website, including her completion of a treatment questionnaire and creation of an account, Hims's Meta tracking tools acquired and transmitted health-related communication contents, including the treatment she was seeking, together with identifiers enabling Meta to associate that information with her. This allegation rests on her use of the Hers intake and account-registration functions, the FTC's allegations that Hims deployed the Meta Pixel and Conversions API on both Platforms and transmitted treatment-associated Complete Registration Events, and the Hers-specific tracking-event audience identified in paragraph 15. Upon information and belief, Hims continued those advertising tracking practices during her visits. The specific parameters and transmissions associated with her visits are recorded in Hims's event, account, and advertising systems.

111. Ms. Mullins did not know of, and did not consent to, any of these transmissions. Had she known that her treatment interests and health-related communications would be disclosed to outside advertising companies and linked to her identity, she would not have used the Hers Website or would not have answered the questions.

112. Upon information and belief, Ms. Mullins's disclosed information remains in the possession of the advertising recipients. She remains interested in the treatments Hims markets and would use the Hers Website again were it not intercepting and disclosing her communications in the manner alleged.

**3. Plaintiff Scott M. Eckard**

113. Plaintiff Scott M. Eckard is a citizen and resident of the State of Florida who lives in Haines City, Polk County, Florida. Within the year preceding the filing of this Complaint, and within the applicable limitations period, Mr. Eckard used the Hims Website on one or more occasions while physically located in Florida.

114. Mr. Eckard came to the Hims Website from a Hims advertisement concerning low testosterone and libido. He accessed the Hims Website from his Apple iPhone 17 Pro Max, using the Google Chrome browser. He did not use a virtual private network, an ad blocker, or a private or incognito browsing mode. Each of the Trackers described above therefore operated on his device in the ordinary manner alleged.

115. Mr. Eckard used the Hims Website's online Low Testosterone Symptom Calculator, answering the calculator's questions about his symptoms, including his energy, his need to nap, his sex drive, his erectile function, his muscle strength, his motivation, his mental sharpness, and his mood. He also answered a quiz that appeared on the Hims Website's homepage, and a hair quiz. He also completed a treatment questionnaire for a specific treatment, answering questions about his symptoms and his treatment goals.

116. Before interacting with the Hims Website, Mr. Eckard was not presented with any cookie banner, pop-up, checkbox, clickwrap, or other affirmative request for permission to disclose his answers or his health-related browsing to the Third-Party Recipients. As alleged in Section E above, the Low Testosterone Symptom Calculator presents no consent control of any kind at any point in its flow, and every answer Mr. Eckard gave on that surface was transmitted to Amplitude as he gave it.

117. In the course of the treatment questionnaire, Mr. Eckard was later directed to a screen asking him to select his state and to create an account, and he created an account. He was subsequently presented with a checkbox stating that he agreed to terms of use and a telehealth consent, and he checked it in order to complete the consultation. By the time he did so, every answer he had given on the Low Testosterone Symptom Calculator, on the homepage quiz, on the hair quiz, and on the first stage of the treatment questionnaire had already been transmitted to

Amplitude, and checking the box did not and could not recall those transmissions. The documents the checkbox referenced named neither Amplitude nor Datadog, said nothing of advertising, analytics, pixels, or cookies, and did not disclose—let alone request permission for—the transmissions alleged in this Complaint. The transmissions continued after he checked the box.

118. Mr. Eckard never purchased, subscribed to, or received any product, medication, or treatment from Hims or Hers.

119. In the same manner documented above in Figures 1 through 4, each answer Mr. Eckard selected on the Low Testosterone Symptom Calculator, the homepage quiz, the hair quiz, and the treatment questionnaire was transmitted in real time to Amplitude—as an event property, and, on the funnel surfaces, again as a write to a durable Amplitude profile—together with his Amplitude device identifier, Hims's persistent visitor cookie, his Facebook advertising cookie, his session identifier, his IP address, and his device and browser information. On the Low Testosterone Symptom Calculator, both the question Hims asked and the answer he gave were transmitted, as documented in Figure 4. In the same manner documented above, the health-condition and product pages he viewed were transmitted on page load to Meta, Snap, Reddit, Microsoft (Bing), Pinterest, and Google, and to The Trade Desk, which matched his identifiers against its cross-web identity graph.

120. Mr. Eckard did not know of, and did not consent to, any of these transmissions. Had he known that his answers about his energy, his sex drive, his erectile function, and his mood would be transmitted in real time to outside analytics and advertising companies and written into a lasting profile of him, he would not have used the Hims Website or would not have answered the questions.

121. Mr. Eckard's information remains in the possession of the Third-Party Recipients. He remains interested in treatment for the conditions that brought him to the Hims Website and would use the Hims Website again were it not intercepting and disclosing his communications in the manner alleged.

## INJURY TO PLAINTIFFS AND CLASS MEMBERS

122. Hims's procurement of the unauthorized interception of visitors to the Websites'

communications has caused actual harm to Plaintiffs and Class Members in multiple ways.

123. **Invasion of Privacy.** The information disclosed—the condition for which a visitor sought treatment, the symptom he or she reported, the mood he or she reported, the treatment he or she was considering, and the medication he or she was researching—is among the most private information an individual possesses. Its disclosure to analytics and advertising companies, joined to identifiers that name the individual, is a highly offensive intrusion and an invasion of privacy in itself.

124. **Disclosure of Information the Law Forbids Disclosing.** As alleged in Section K above, the information Hims disclosed is individually identifiable health information that federal law prohibits disclosing for marketing purposes without authorization. The injury from such a disclosure is the kind Congress and the Department of Health and Human Services have expressly recognized: exposure to embarrassment, stigma, and discrimination, and the chilling of the willingness to seek care. That harm is concrete, and it is complete upon disclosure.

125. **Commercial Exploitation and Loss of Control.** Hims caused Plaintiffs' and Class Members' sensitive communications to be disclosed to analytics and advertising recipients, and used the resulting data flows to obtain advertising, measurement, audience-building, attribution, and subscriber-acquisition benefits. Plaintiffs and Class Members thereby lost control over information they had communicated for the limited purpose of obtaining medical treatment, and received nothing in return for the commercial value Hims extracted from it.

126. **Diminished Confidence in Health Care Privacy.** The unauthorized interception of these communications has undermined Plaintiffs' and Class Members' ability to seek medical information and treatment confidentially, and to answer a clinical intake question honestly, without fear that their answers are being routed to advertising companies.

127. **Risk of Further Use of the Intercepted Data.** Once acquired by the Third-Party Recipients, Plaintiffs' and Class Members' data is beyond their control and may be further processed, combined with other data, appended to existing profiles, and used or resold for advertising and profiling. A recipient that learns a particular person sought treatment for erectile dysfunction, depression, or obesity can target that person, price advertising to that person, and

enrich the profile it already holds on that person, indefinitely.

128. **Statutory Injury.** Independent of the foregoing harms, Hims's violations of the Wiretap Act and the FSCA have caused Plaintiffs and Class Members to suffer statutory injury, entitling them to the remedies those statutes provide, including statutory and liquidated damages.

**CLASS ACTION ALLEGATIONS**

129. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

130. As used in this Complaint, the "Class Period" means the period beginning on the earliest date permitted by the applicable statutes of limitations, including the benefit of any applicable tolling or delayed-discovery principles, and continuing through the date of judgment.

131. Plaintiffs seek to represent the following Nationwide Class:

> All persons in the United States who visited either or both of Defendant's websites, www.hims.com or www.forhers.com, and whose electronic communications were intercepted by one or more third-party tracking technologies deployed by Defendant during the Class Period.

132. Plaintiffs also seek to represent the following Florida Subclass:

> All members of the Nationwide Class who are residents of the State of Florida and whose electronic communications were intercepted during visits to www.hims.com or www.forhers.com while physically located in Florida.

133. The Nationwide Class and the Florida Subclass are together referred to as the "Classes," and their members as "Class Members." Counts I and IV are asserted on behalf of the Nationwide Class. Counts II, III, and V are asserted on behalf of the Florida Subclass.

134. Excluded from the Classes are: (a) Defendant, its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (b) the Third-Party Recipients, and their officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (c) any governmental entities; (d) the judge(s) to whom this case is assigned and their immediate families and staff; and (e) Plaintiffs' counsel and their immediate families.

135. Plaintiffs reserve the right to modify, change, or expand the Class definitions based upon discovery and further investigation.

136. Numerosity. The Classes are so numerous that joinder of all members is

impracticable. Hims operates both Websites nationwide. The FTC alleges millions of consumer identifiers and tracking events were shared with advertising platforms, including Hers-specific lists and event audiences. Upon information and belief, the proposed Nationwide Class numbers in the millions, and Florida residents comprise at least tens of thousands of its members. The precise number of persons whose communications were intercepted during the Class Period can be determined from Defendant's and the recipients' records.

137. Ascertainability. The Classes are ascertainable through objective criteria using Defendant's web-server logs, website-domain and intake records, account records, tracking-event records, server-side relay logs and configuration, and recipients' advertising and analytics records. Those records identify the relevant Website, event, date, identifiers, and, upon information and belief, the visitor's location at the time of interception. The applicable records and transmitted parameters vary by site and technology; membership does not require that every visitor encountered every Tracker or that all visitors' data reached the same recipient.

138. **Commonality and Predominance.** There are questions of law and fact common to the Classes that predominate over any questions affecting only individual members. These common questions include:

(a) Whether Hims implemented the Trackers on its Websites;

(b) Whether the Trackers acquired the contents of visitors to the Websites' electronic communications;

(c) Whether the Trackers acquired those contents contemporaneously with their transmission;

(d) Whether Hims procured, enabled, directed, authorized, or caused the Third-Party Recipients to intercept visitors to the Websites' electronic communications;

(e) Whether the Third-Party Recipients were parties to the communications they acquired;

(f) Whether Hims procured the interception for the purpose of committing a criminal or tortious act within the meaning of 18 U.S.C. § 2511(2)(d);

(g) Whether Hims obtained visitors to the Websites' consent to the interception of their

electronic communications;

(h) Whether Hims's conduct violated 18 U.S.C. § 2511;

(i) Whether Hims's conduct violated Fla. Stat. § 934.03;

(j) Whether Hims breached a duty of confidence owed to Plaintiffs and Class Members;

(k) Whether Hims has been unjustly enriched through its conduct;

(l) Whether Hims's conduct constituted an unfair or deceptive act or practice within the meaning of Fla. Stat. § 501.204;

(m) Whether Plaintiffs and Class Members are entitled to damages and other monetary relief, and if so, in what amount; and

(n) Whether Plaintiffs and Class Members are entitled to equitable relief, including declaratory and injunctive relief.

139. These common questions concern Hims's centralized decisions to deploy third-party tracking, disclose health-related communications, obtain consent, and use the resulting data for commercial purposes on its Hims and Hers Websites. Plaintiffs challenge that common course of conduct. Site-specific differences in tracking tools, parameters, or consent interfaces can be evaluated from Hims's configurations and records and, if necessary, addressed through subclasses or issue certification.

140. Any individualized questions—such as which particular pages a given Class Member visited, which particular answers he or she selected, or the precise dates of his or her visits—do not predominate, and in any event are answerable from Defendant's and the Third-Party Recipients' records. Courts routinely hold that predominance is satisfied in website-tracking cases because the core liability inquiry focuses on the defendant's uniform deployment of tracking technology without consent, not on the content of any individual visitor's session.

141. Typicality. Plaintiffs' claims arise from the same challenged course of conduct and rest on the same legal theories as the claims of other Class Members: Hims's procurement of third-party acquisition and disclosure of health-related electronic communications without consent. Mr. Holbrook and Mr. Eckard used the Hims Website; Ms. Mullins used the Hers Website at

www.forhers.com. Each Plaintiff is a Florida resident who used the respective Website while physically located in Florida and is a member of both the Nationwide Class and the Florida Subclass. Together, Plaintiffs' experiences encompass both Websites.

142. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have no interests adverse or antagonistic to those of the Classes, and have retained counsel experienced in complex class action litigation, including class actions involving privacy violations, unlawful data collection, and the interception of electronic communications in the health care context. Plaintiffs and their counsel intend to prosecute this action vigorously.

143. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by many Class Members may be relatively small compared to the burden and expense of individual litigation, making it difficult for Class Members individually to redress the wrongs done to them. Prosecution of separate actions would create a risk of inconsistent or varying adjudications and would be inefficient for the parties and the Court. A class action presents far fewer management difficulties and provides the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

144. **Injunctive and Declaratory Relief.** Hims has acted or refused to act on grounds generally applicable to the Classes as a whole, making final injunctive relief and corresponding declaratory relief appropriate with respect to the Classes as a whole under Rule 23(b)(2). Hims's conduct is ongoing, and the Trackers, the consent interface, and the disclosures challenged here remain in place.

145. **Issue Certification.** Alternatively, Plaintiffs seek certification of the common issues identified above under Rule 23(c)(4). Certification of those issues would materially advance the litigation, promote uniform adjudication of Defendant's common conduct, and narrow any individualized questions that may remain after the class-wide issues are resolved.

## CAUSES OF ACTION

### COUNT I
### Violation of the Electronic Communications Privacy Act
### (18 U.S.C. §§ 2511(1)(a), (1)(c), (1)(d), 2520)
### (On Behalf of Plaintiffs and the Nationwide Class)

146. Plaintiffs incorporate paragraphs 1–145 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Nationwide Class.

147. The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

148. The Act imposes liability on any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication," 18 U.S.C. § 2511(1)(a); who intentionally discloses the contents of any electronic communication knowing or having reason to know that the information was obtained through such an interception, *id.* § 2511(1)(c); and who intentionally uses the contents of any electronic communication with the same knowledge, *id.* § 2511(1)(d).

149. The Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device," 18 U.S.C. § 2510(4), and "contents," when used with respect to any communication, to include "any information concerning the substance, purport, or meaning of that communication," *id.* § 2510(8).

150. The transmissions between Plaintiffs and Class Members and Hims's Websites are "electronic communications" within the meaning of 18 U.S.C. § 2510(12), because they are transfers of signs, signals, writing, images, sounds, data, or intelligence transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system affecting interstate or foreign commerce.

151. The Trackers are "electronic, mechanical, or other device[s]" within the meaning of 18 U.S.C. § 2510(5). They are apparatus and code that can be used and are used to intercept electronic communications, and they are not used by a provider of wire or electronic communication service in the ordinary course of its business within the meaning of § 2510(5)(a).

152. The Trackers acquire the "contents" of Plaintiffs' and Class Members' electronic communications, not merely record, routing, or addressing information. The answer to "How do you want to improve your performance?", the answer to "how are you feeling today?", the answer to "Do you have a sad or depressed mood most of the time?", and the answer to "Which best represents your hair loss and goals?" are the substance, purport, and meaning of the visitor's communication. On the Low Testosterone Symptom Calculator, the question itself is transmitted verbatim alongside the answer. The addresses of the health-condition and prescription-product pages are likewise contents, because the page address itself conveys the substance of what the visitor sought.

153. The interception is contemporaneous with transmission. Through the tracking tools applicable to the visitor's interaction, third-party recipients acquire health-related communication contents as the visitor interacts with the respective Website, rather than merely obtaining a stored communication after the exchange has ended. The Hims answer-event examples and the Hers treatment-associated registration events are described above.

154. Hims intentionally procured the Third-Party Recipients to acquire these communications by deploying the tracking tools applicable to the visitor's interaction on the respective Website and configuring those tools to transmit health-related contents and identifiers to outside recipients. The Hims answer-event and relay configurations and the Hers treatment-associated Meta events are described above. Hims intentionally disclosed and used the acquired contents to obtain advertising, measurement, audience-building, attribution, and subscriber-acquisition benefits.

155. Hims acted intentionally. The mapping of a specific health-answer field into a third-party request is an engineering decision that cannot occur by accident, and Hims demonstrated that it knew how to withhold a field from third parties by doing exactly that at other steps of the same funnels.

156. The one-party consent exception at 18 U.S.C. § 2511(2)(d) does not apply.

157. First, the Third-Party Recipients were not parties to the health-related communications they acquired. Plaintiffs and Class Members addressed those communications to

Hims through the respective Website in order to obtain treatment or health information. They did not knowingly direct those communications to the analytics or advertising recipients identified for the relevant interaction and did not intend to communicate their confidential health information to them. The recipients' acquisition occurred through tracking tools deployed by Hims without Plaintiffs' consent.

158. **Second**, to the extent Hims contends that it was a party to the communications and that its own consent suffices, the exception is unavailable because Hims procured the interception "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). Hims procured the interception for the purpose of committing, and in committing: (a) violations of the Florida Security of Communications Act, Fla. Stat. § 934.03, a violation of which is a felony of the third degree, Fla. Stat. § 934.03(4)(a); (b) breach of the confidence reposed in it by Plaintiffs and Class Members, as alleged in Count III; and (c) unfair and deceptive acts and practices in violation of Fla. Stat. § 501.204, as alleged in Count V.

159. **Third**, the criminal and tortious purpose alleged above is independent of the act of interception itself. Hims's purpose was to obtain visitors' sensitive health answers and health-related browsing for commercial exploitation in advertising, audience-building, and subscriber acquisition, and to deliver those answers to companies that resell and profile them, while simultaneously representing to those same visitors that their "medical records and sensitive information are only accessed by the medical providers managing [their] care," that its process is "100% online, private, and secure," and that its service is "discreet" and "totally private." The tortious and criminal character of that conduct does not consist merely in the interception; it consists in the deceptive procurement of confidential health information and its commercial exploitation.

160. Neither Plaintiffs nor Class Members consented to the interception, disclosure, or use of their communications. As described above, the Hims Website's observed controls were absent on certain functions or appeared after transmission and did not authorize the challenged disclosures. Ms. Mullins was not presented with an adequate request to authorize advertising

disclosures before the Hers interactions alleged in her individual section and did not consent to them. A treatment authorization, a passive policy reference, or a later checkbox does not supply consent to an earlier acquisition of communications or to disclosures beyond the specific conduct actually authorized.

161. As a direct and proximate result of Hims's violations, Plaintiffs and Class Members are entitled to: (a) preliminary, equitable, and declaratory relief as may be appropriate, 18 U.S.C. § 2520(b)(1); (b) damages under § 2520(c)(2), consisting of the greater of the sum of the actual damages suffered and any profits made by Hims as a result of the violation, or statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000; (c) punitive damages, *id.* § 2520(b)(2); and (d) reasonable attorneys' fees and other litigation costs reasonably incurred, *id.* § 2520(b)(3).

162. This Count is timely. The limitations period under 18 U.S.C. § 2520(e) runs from the date on which the claimant first has a reasonable opportunity to discover the violation. The interception alleged here occurs invisibly, in code executing in the visitor's browser, and is not detectable by an ordinary visitor; Plaintiffs had no reasonable opportunity to discover it until the practices were publicly disclosed, and this action is brought within the applicable limitations period.

**COUNT II**
**Violation of the Florida Security of Communications Act**
**(Fla. Stat. § 934.03)**
**(On Behalf of Plaintiffs and the Florida Subclass)**

163. Plaintiffs incorporate paragraphs 1–145 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Florida Subclass.

164. The FSCA prohibits intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any electronic communication. Fla. Stat. § 934.03(1)(a). The FSCA is an all-party consent statute: interception is lawful only where all parties to the communication have given prior consent. Fla. Stat. § 934.03(2)(d).

165. The FSCA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3). It defines "contents," when used with respect to any

communication, to include "any information concerning the substance, purport, or meaning of that communication." Fla. Stat. § 934.02(7). The FSCA was designed to protect precisely the privacy interest invaded here.

166. The transmissions between Plaintiffs and Florida Subclass Members and Hims's Websites constitute "electronic communications" within the meaning of Fla. Stat. § 934.02(12), because they are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system.

167. The Trackers deployed on Hims's Websites constitute "electronic, mechanical, or other device[s]" within the meaning of the FSCA. Unlike session-replay technology that merely records mouse movements, the Trackers here actively acquire and transmit the contents of visitors' communications, including the answer the visitor selected to each health question and the address of the condition or product page he or she requested.

168. The Trackers intercept the "contents" of Plaintiffs' and Florida Subclass Members' electronic communications, not merely routing or addressing information. The answer to "How do you want to improve your performance?", the answer to "how are you feeling today?", the answer to "Do you have a sad or depressed mood most of the time?", and the answer to "Which best represents your hair loss and goals?" are the substance, purport, and meaning of the visitor's communication. On the Low Testosterone Symptom Calculator, the question itself is transmitted verbatim alongside the answer. These are contents in the most literal sense the statute contemplates. The Hers treatment-associated registration events likewise convey the substance of the treatment the visitor seeks, rather than merely the existence of a network connection.

169. The interception is contemporaneous with transmission. Through the tracking tools applicable to the visitor's interaction, third-party recipients acquire health-related communication contents as the visitor interacts with the respective Website, rather than merely obtaining a stored communication after the exchange has ended. The Hims answer-event examples and the Hers treatment-associated registration events are described above.

170. Hims intentionally procured the Third-Party Recipients to acquire these

communications by deploying the tracking tools applicable to the visitor's interaction on the respective Website and configuring those tools to transmit health-related contents and identifiers to outside recipients. The Hims answer-event and relay configurations and the Hers treatment-associated Meta events are described above. Hims intentionally disclosed and used the acquired contents to obtain advertising, measurement, audience-building, attribution, and subscriber-acquisition benefits.

171. Neither Plaintiffs nor Florida Subclass Members consented to this interception. The FSCA requires the prior consent of all parties. As described above, the Hims Website's observed controls were absent on certain functions or appeared after transmission and did not authorize the challenged disclosures. Ms. Mullins was not presented with an adequate request to authorize advertising disclosures before the Hers interactions alleged in her individual section and did not consent to them. A treatment authorization, a passive policy reference, or a later checkbox does not supply consent to an earlier acquisition of communications or to disclosures beyond the specific conduct actually authorized.

172. As a direct result of Hims's violations, Plaintiffs and Florida Subclass Members are entitled to: (a) actual damages, or liquidated statutory damages computed at the higher of $100 per day for each day of violation or $1,000; (b) punitive damages; and (c) reasonable attorneys' fees and other litigation costs reasonably incurred. Fla. Stat. § 934.10(1).

173. Plaintiffs and Florida Subclass Members are also entitled to preliminary and other equitable or declaratory relief as appropriate, Fla. Stat. § 934.10(1)(a), including an injunction preventing Hims from continuing to deploy the Trackers to intercept their electronic communications without the consent of all parties.

## COUNT III
## Breach of Confidence
## (On Behalf of Plaintiffs and the Florida Subclass)

174. Plaintiffs incorporate paragraphs 1–145 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Florida Subclass.

175. A claim for breach of confidence requires an "unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential

relationship." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 932 (11th Cir. 2020) (en banc). The claim is rooted in the principle that the law should recognize certain relationships as confidential in order to encourage the free flow of information within them.

176. Under Florida law, a confidential relationship exists where "confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused." *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002). Whether a confidential relationship exists is ordinarily a question of fact not appropriately resolved on a motion to dismiss.

177. A confidential relationship existed between Hims and Plaintiffs and Florida Subclass Members. Hims holds itself out as a telehealth company that furnishes and coordinates medical care; it invites visitors to disclose their conditions, symptoms, moods, treatment goals, and medical histories for the express purpose of obtaining that care; it publishes privacy materials representing that it safeguards the information visitors submit; and it advertised that visitors' "medical records and sensitive information are only accessed by the medical providers managing your care," that its process was "100% online, private, and secure," and that its service was "discreet" and "totally private." Hims solicited the confidence and accepted the trust.

178. The information Hims disclosed is nonpublic. It includes the plain-text answers Plaintiffs and Florida Subclass Members selected on Hims's health questionnaires, quizzes, and symptom calculator; the conditions, symptoms, moods, family histories, treatment goals, and medications those answers identify; and the addresses of the condition and product pages they requested, each of which encodes the condition being researched.

179. Hims disclosed that nonpublic information to third parties. By deploying and procuring tracking tools on the respective Websites, Hims caused health-related communication contents to reach the analytics or advertising recipients applicable to the interaction, together with identifiers permitting linkage to the visitor. The detailed Hims answer transmissions and the Hers treatment-associated advertising events are alleged above.

180. The disclosures were unconsented and unprivileged. Plaintiffs and Florida Subclass Members were not presented with an adequate request for permission before the challenged transmissions and did not authorize disclosure of their confidential health-related communications

to outside analytics or advertising companies. The inadequacies of the observed Hims controls and the lack of Ms. Mullins's consent on the Hers Website are described above.

181. Hims breached the confidence reposed in it. It made the deliberate decision to deploy and procure the Trackers on precisely those functions through which visitors disclose their most sensitive information—the intake questionnaires, the symptom calculator, the quizzes, and the condition and product pages—and it did so with knowledge, including from the guidance of the Department of Health and Human Services, Office for Civil Rights, described above, that doing so transmits protected health information to third-party vendors.

182. As a direct and proximate result of Hims's breach of confidence, Plaintiffs and Florida Subclass Members have been injured. They suffered an invasion of privacy, lost control over their confidential health information, sustained a diminished ability to seek medical information and care in confidence, and face the ongoing risk that the disclosed information will be further processed, combined with other data, and used or resold for advertising and profiling.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class, Pleaded in the Alternative)**

183. Plaintiffs incorporate paragraphs 1–6, 18–87, and 97–121 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Nationwide Class. This Count does not incorporate the paragraphs alleging Defendant's violations of the Wiretap Act, of the FSCA, of FDUTPA, or of HIPAA, its breach of confidence, or the injury allegations, and does not rely on any of them to supply the unjust factor.

184. Plaintiffs plead this Count in the alternative to Counts I, II, III, and V, and to the extent Plaintiffs and Class Members are found to have no adequate remedy at law. It rests on the independent equitable principle that Hims solicited, received, and retained the benefit of Plaintiffs' and Class Members' personal and health-related data without paying for it.

185. The conduct giving rise to this Count emanated from a single place. Hims designed, configured, and deployed the Trackers and the server-side relay, drafted the privacy disclosures and consent interface, and made the decision to route visitors' health answers to the Third-Party Recipients, from its headquarters in San Francisco, California. The benefit Hims received was

received there. California law may therefore be applied to the Nationwide Class consistent with due process. In the alternative, the equitable principles governing unjust enrichment do not vary in any material respect among the States in a manner that would defeat classwide adjudication of the common questions identified above, and Plaintiffs reserve the right to propose State-law subclasses or groupings should the Court conclude otherwise.

186. Hims received a benefit from Plaintiffs and Class Members by inducing them to provide valuable personal and health-related data through the Websites' intake questionnaires, quizzes, symptom calculator, and condition and product pages, and then putting that data to use for its own commercial purposes.

187. By implementing the Trackers on its Websites and by operating its server-side relay, Hims obtained analytics, conversion measurement, retargeting, audience-building, advertising attribution, and subscriber-acquisition benefits. Those benefits enabled Hims to identify and retarget high-intent prospects, improve the efficiency of the paid digital advertising on which its business depends, and increase the volume of consultations, prescriptions, and subscriptions, thereby enriching itself at the expense of Plaintiffs and Class Members.

188. Private information, and in particular sensitive health-related information, has value. Hims's own Privacy Policy states that Hims "may sell your sensitive personal data," an acknowledgment by Hims that the data it took has market value.

189. Hims knowingly accepted and retained the analytics, advertising, attribution, audience, and acquisition benefits produced through the challenged transmissions. Hims has never compensated Plaintiffs or Class Members for the data that generated those benefits, and it would be inequitable for Hims to retain the value it received without paying fair value for it.

190. Because Hims retained a benefit conferred by Plaintiffs and Class Members without paying its fair value, Plaintiffs and Class Members are entitled to restitution and disgorgement of the profits, benefits, and other compensation Hims obtained from the use of their personal and health-related data.

**COUNT V**
**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**(Fla. Stat. § 501.201, et seq.)**
**(On Behalf of Plaintiffs and the Florida Subclass — Declaratory and Injunctive Relief Only)**

191. Plaintiffs incorporate paragraphs 1–145 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Florida Subclass.

192. FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). The Act is to be construed liberally to protect the consuming public. Fla. Stat. § 501.202(2).

193. Hims is engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8): it advertises, solicits, offers, and distributes medical treatment, prescription medications, and related services to consumers in Florida.

194. **Plaintiffs seek no damages under this Count.** Plaintiffs bring this Count solely for the declaratory and injunctive relief that Fla. Stat. § 501.211(1) affords to "anyone aggrieved by a violation" of the Act, together with the attorneys' fees and costs available under Fla. Stat. § 501.2105. Actual damages are not an element of a claim for declaratory or injunctive relief under § 501.211(1); that requirement applies only to a claim for damages under § 501.211(2). *See Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. 1st DCA 2000) (holding that a plaintiff need not prove actual damages to obtain injunctive relief under FDUTPA, because the availability of injunctive relief turns on protection of the consuming public rather than on individual loss). Plaintiffs expressly disclaim any recovery of damages under this Count.

195. Plaintiffs are persons aggrieved by Hims's violations: each used the respective Website, answered health questions, and, as alleged in the individual sections, had health-related communication contents disclosed to outside recipients through the challenged practices. Ms. Mullins's claim concerns forhers.com; Mr. Holbrook's and Mr. Eckard's claims concern hims.com.

196. Hims's conduct is deceptive. As alleged above and in the FTC Action, Hims represented in advertising for its Platforms that consumers' health information would remain

private, while using advertising tracking tools to disclose treatment interests and identifiers to third parties. The detailed Hims Website examples also show health answers reaching Amplitude and Datadog and condition-labeled visits reaching advertising platforms. The Hers-specific examples show treatment-associated events and customer lists reaching advertising platforms. Those representations were likely to mislead reasonable consumers concerning the confidentiality of the health information they entrusted to Hims.

197. Hims's conduct is independently deceptive by omission. In making those representations, Hims failed to disclose, and failed adequately to disclose, that it shares consumers' sensitive health information with analytics and advertising companies. That fact would be material to a reasonable consumer's decision whether to answer Hims's health questions at all.

198. Hims's health quizzes carry a further, specific misrepresentation. Directly beneath the answer choices, the hair-loss quiz tells the visitor that "[t]he quiz is not a medical assessment and your responses will not be shared with a medical provider"—while the answer he or she selects is transmitted, in the instant it is selected, to Amplitude and Datadog with his or her Facebook advertising cookie attached. The Low Testosterone Symptom Calculator transmits every answer the same way—including the visitor's answers concerning his sex drive, his erectile function, and whether he has "a sad or depressed mood most of the time"—with no consent control of any kind anywhere in the flow.

199. Hims's consent practices are also unfair and deceptive. On the tested Hims Website, the "Got it" notice provides no option to refuse, appears after tracking has occurred, and accompanies a failure to honor Global Privacy Control; Hims's code calls it "custom-wiretap-banner." As to the Hers Website, Ms. Mullins was not asked to authorize the advertising disclosures alleged in her individual section before the relevant interactions. These practices impair consumers' ability to choose whether to disclose sensitive health information to outside recipients.

200. Hims's conduct is also unlawful, and an act that violates another law is an unfair or deceptive practice under FDUTPA. Hims's interception of Plaintiffs' and Florida Subclass Members' electronic communications violates 18 U.S.C. § 2511 and Fla. Stat. § 934.03, as alleged in Counts I and II.

201. The FTC Action alleges the same deceptive privacy representations and the same failure to disclose, on behalf of the Federal Trade Commission, the People of the State of California, and the Utah Division of Consumer Protection. It also alleges that Hims did not stop the conduct when consumers complained, and did not stop when it learned of the FTC's investigation.

202. Declaratory and injunctive relief is necessary and appropriate. Upon information and belief, Hims continues the challenged advertising tracking and health-information disclosure practices on both Websites. The Hims-specific analytics, relay, notice, and Global Privacy Control practices are described above. Upon information and belief, improperly disclosed information remains in recipients' systems. Mr. Holbrook and Mr. Eckard would use the Hims Website again, and Ms. Mullins would use the Hers Website again, if their confidential health communications were protected from the challenged disclosures. Absent an injunction, Plaintiffs, Florida Subclass Members, and the consuming public remain exposed to those practices.

203. Plaintiffs, on behalf of themselves and the Florida Subclass, are entitled to a declaration that the practices described above violate Fla. Stat. § 501.204, to a permanent injunction under Fla. Stat. § 501.211(1) restraining those practices, and to reasonable attorneys' fees and costs under Fla. Stat. § 501.2105.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all other Class Members similarly situated, respectfully request that this Court:

(a) Certify this case as a class action on behalf of the proposed Nationwide Class and the proposed Florida Subclass, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel;

(b) Declare that Hims's actions, as described herein, violate the Wiretap Act, the FSCA, and FDUTPA, and constitute a breach of confidence and unjust enrichment;

(c) Award Plaintiffs and the Class compensatory damages in an amount to be determined at trial;

(d) Award Plaintiffs and the Nationwide Class damages under 18 U.S.C. § 2520(c)(2),

consisting of the greater of the sum of the actual damages suffered and any profits made by Hims as a result of the violation, or statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000 per Class Member;

(e) Award Plaintiffs and the Florida Subclass liquidated statutory damages as provided by the FSCA, computed at the higher of $100 per day for each day of violation or $1,000 per Florida Subclass Member;

(f) Award Plaintiffs and the Class punitive damages;

(g) Award Plaintiffs and the Nationwide Class restitution and disgorgement of all profits, benefits, and other compensation Hims obtained from the use of their personal and health-related data;

(h) Enter a declaratory judgment and a permanent injunction under 18 U.S.C. § 2520(b)(1) and Fla. Stat. §§ 501.211(1) and 934.10(1)(a) requiring Hims, as to both www.hims.com and www.forhers.com and the tracking technologies applicable to each site, to cease procuring the interception of visitors to the Websites' communications without consent; to disable or segregate the Trackers from its intake questionnaires, symptom calculators, quizzes, condition pages, product pages, and other health-related functions unless valid prior consent and authorization are obtained; to cease transmitting condition-labeled events through its server-side relay; to request the deletion of improperly transmitted data from the Third-Party Recipients; to present a consent mechanism that affords a means of refusal as easy and prominent as the means of acceptance; to honor the Global Privacy Control signal; and to disclose accurately and conspicuously every category of recipient to which it transmits visitors' health information;

(i) Award Plaintiffs and the Class pre-judgment and post-judgment interest;

(j) Award Plaintiffs and the Class reasonable attorneys' fees and costs, as allowed by law, including under 18 U.S.C. § 2520(b)(3) and Fla. Stat. §§ 934.10(1)(d) and 501.2105; and

(k) Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: September 18, 2026

Respectfully submitted,

By: */s/ Amber L. Schubert*

AMBER L. SCHUBERT (SBN 278696)
aschubert@awkolawllp.com
SONUM DIXIT (SBN 353395)
sdixit@awkolawllp.com
Of Counsel
**AYLSTOCK WITKIN KREIS & OVERHOLTZ PLC**
2193 Fillmore Street
San Francisco, CA 94115
Telephone: (415) 251-6799

ADAM A. SCHWARTZBAUM
(*pro hac vice* application forthcoming)
Florida Bar No. 93014
adam@schwartzbaum.com
**SCHWARTZBAUM**
14 NE 1st Avenue, Suite 705
Miami, FL 33132
Telephone: (786) 453-8485

**Attorneys for Plaintiffs and the Proposed Classes**